UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ONE OR MORE UNKNOWN PURCHASERS OF CALL OPTIONS FOR THE COMMON STOCK OF DRS TECHNOLOGIES, INC. AND AMERICAN POWER CONVERSION CORP., | : |
| | : |
| Defendant. | : |

**08 A CIV 6609**

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM IN SUPPORT OF APPLICATION FOR AN *EX PARTE*
TEMPORARY RESTRAINING ORDER FREEZING ASSETS
AND GRANTING OTHER RELIEF, AND FOR AN ORDER TO SHOW
CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED**

This is an emergency application brought by the Securities and Exchange Commission

("Commission") for an order freezing proceeds from highly profitable and suspicious purchases

of call option contracts for the common stock of DRS Technologies, Inc. ("DRS") and American

Power Conversion Corp. ("APCC") made through an account at UBS AG in Zurich, Switzerland

("UBS Zurich"), by one or more unknown purchasers ("Unknown Purchaser"). Twice in a

period of less than two years, Unknown Purchaser made well-timed purchases of call options of

these two different corporations in the days and weeks immediately preceding public disclosures

and announcements relating to these companies' ultimate acquisitions. In both cases, there was

no public information available concerning the planned acquisitions before Unknown Purchaser

purchased the call options.

In the first instance, beginning on September 21, 2006 and continuing through October 20, 2006, the Unknown Purchaser made purchases of 2,830 APCC call options that were out-of-the-money. After Schneider publicly announced on October 30, 2006, its intention to acquire all of the outstanding shares of APCC, the price of APCC stock increased by 26 percent.

On October 30, 31,and November 3, 2006, following the merge announcement, Unknown Purchaser liquidated his APCC call options holdings and realized a profit of approximately $1.7 million.

Less than two years later, beginning on April 29, 2008 and ending on May 7, 2008, the Unknown Purchaser bought 1,820 DRS call options that were out-of-the-money and due to expire shortly. On May 8, 2008, the day after the Unknown Purchaser made his last acquisition of DRS call options, it was publicly reported for the first time that Finmeccanica SpA ("Finmeccanica") was in advanced talks to purchase DRS. On May 12, 2008, Finmeccanica announced that it would acquire DRS for $5.2 billion, or $81 a share. Prior to May 8, 2008, information concerning Finmeccanica's interest in acquiring DRS was confidential and nonpublic. As a result of the announcement concerning the Finmeccanica-DRS deal, the common stock of DRS rose rapidly, reaching $73.89 per share when trading closed on May 8, 2008.

On the same day of the public announcement concerning Finmeccanica's discussions with DRS, Unknown Purchaser liquidated his entire DRS call option holding and realized a profit of approximately $1.6 million.

As described below, the Commission has reason to believe that Unknown Purchaser engaged in illegal insider trading. Because the Unknown Purchaser is trading through accounts in Switzerland, and is now aware that the Commission is investigating both the purchase of

2

APCC call options and DRS call options, there is substantial risk that Unknown Purchaser will attempt to transfer the illicit proceeds from these transactions beyond the jurisdiction of United States courts. The Commission therefore requests an immediate asset freeze in order to maintain the status quo and other expedited relief in order to resolve this case without further taxing this Court's limited resources.

### STATEMENT OF FACTS

I.    **The APCC Transaction**

    A.    **The Purchase of APCC Call Options by Unknown Purchaser**

Schneider Electric SA ("Schneider") headquartered in Rueil-Malmaison, France, designs, manufactures, and sells electrical distribution equipment, industrial robots, and secured power equipment. Shares of Schneider trade on NYSE Euronext Paris under the ticker symbol PA. Declaration of Ilana Sultan ("Sultan Decl.") ¶ 7. Prior to its merger with Schneider, APCC was a Massachusetts corporation headquartered in West Kingston, Rhode Island. APCC engaged in the design, development, manufacturing, and marketing of power protection and management solutions for computer, communications, and electronic applications worldwide. APCC stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and traded on NASDAQ. In October 2006, APCC had a market capitalization of approximately $4.5 billion. Options for APCC shares traded on the Boston Stock Exchange, Chicago Board Options Exchange, the International Securities Exchange, NYSE Arca, and the Philadelphia Stock Exchange. Sultan Decl. ¶ 6.

A call option, or a "call," is a financial contract between the buyer and the seller of this type of option. The buyer of the option has the right, but not the obligation, to buy an agreed quantity of a particular security from the seller of the option at a certain time (the expiration

3

date) for a certain price (the strike price). The buyer pays a fee (called a premium) for this right. A call option contract typically gives the buyer the right to purchase 100 shares of the underlying security. The buyer of a call option wants the price of the underlying security to rise in the future. When the market price of the security exceeds the strike price of the option, the purchaser of the option can sell the option at the market for a premium. When the market price of the security exceeds the strike price, the option is said to be "in-the-money." The option increases in value when it is "in-the-money."

On or about September 13, 2006, Schneider sent an "indication of interest" letter to the Chairman of the Board of Directors of APCC and the chief executive officer ("CEO") of APCC, expressing Schneider's interest in pursuing a strategic combination with APCC. APCC's Board of Directors reviewed Schneider's "indication of interest" letter on or about September 19, 2006. Sultan Decl. ¶ 8-9.    On or about September 20, 2006, The Chairman of APCC's Board of Directors called Schneider's President and CEO and stated that the APCC's Board of Directors would be willing to have discussions with Schneider about a possible sale of APCC. Sultan Decl. ¶ 10.

On September 21, 2006, the price of a share of APCC common stock reached a high of $21.72 and closed at $21.30. On that same day, Unknown Purchaser bought 1,600 APCC call options due to expire in December 2006 with a strike price of $22.50, and, therefore, on the date they were purchased, the APCC options were not in-the-money. This purchase constituted 87.33 percent of the trading volume for APCC call options in that series and 26 percent of all the APCC options trading on September 21, 2006. Sultan Decl. ¶ 11-12.

On September 22, 2006, the price of a share of APCC common stock reached a high of $21.60 and closed at $21.40. On that same date, Unknown Purchaser bought 800 APCC call

options due to expire in December 2006 with a strike price of $22.50 and, therefore, on the date they were purchased, the APCC options were not in-the-money. This purchase represented 58.78 percent of the trading volume of APCC call options on September 22, 2006 and approximately nine percent of all the APCC options trading on that date. Sultan Decl. ¶ 13-14.

On October 10, 2006, the price of a share of APCC common stock reached a high of $21.98 and closed at $21.93. On that same date, Unknown Purchaser bought 350 APCC call options due to expire in November 2006 with a strike price of $22.50 and, therefore, on the date they were purchased, the APCC options were not in-the-money. This purchase of APCC call options represented 14.5 percent of the trading volume on October 10, 2006, for options in that series. Sultan Decl. ¶ 15-16.

Finally, on October 20, 2006, the price of a share of APCC common stock reached a high of $22.90 and closed at $22.26. On that same date, Unknown Purchaser bought 80 APCC call options due to expire in November 2006 with a strike price of $25 and, therefore, on the date they were purchased, the APCC options were not in-the-money. This purchase of APCC call options accounted for 60.15 percent of the trading volume on October 20, 2006, for options in that series. Sultan Decl. ¶ 17-18.

Thus, between September 21 and October 20, 2006, Unknown Purchaser purchased 2,830 APCC call options, none of which were in-the-money, at a cost of approximately $343,000. All of the purchases of APCC call options by Unknown Purchaser were through an omnibus account known as UBSL A/C Exchange Traded Derivative Account # 452-6020300 ("UBS Omnibus Account"), and cleared through UBS Securities LLC. Sultan Decl. ¶ 21.

**B.    The Announcement of Schneider's Acquisition of APCC**

On Monday, October 30, 2006, at approximately 1:00 a.m. EST,  Schneider announced that it would acquire all of the outstanding shares of APCC for $31 per share, in a transaction valued at approximately $6.1 billion. On October 30, 2006, trading volume in APCC stock and options rose sharply and the price of APCC stock closed at $30.02 per share, approximately 26 percent above its closing price of $23.76 on Friday, October 27, 2006.  Sultan Decl. ¶ 14.  Upon information and belief, prior to the October 30, 2008, announcement, information concerning APCC's interest in being acquired and the potential agreement with Schneider was confidential, nonpublic information.  Sultan Decl. ¶ 4.

**C.    Unknown Purchaser Sells The APCC Call Options**

On October 30, 31, and November 3, 2006, following the announcement of Schneider's acquisition of APCC, Unknown Purchaser liquidated his holdings in APCC call options and realized a profit of approximately $1.7 million.  Sultan Decl. ¶ 20.

**II.    The DRS Transaction**

**A.    The Purchase of DRS Call Options by Unknown Purchaser**

Headquartered in Parsippany, New Jersey, DRS is a Delaware corporation that supplies integrated products, services, and support to military forces, government agencies, and prime contractors worldwide.  Shares of DRS common stock trade on the New York Stock Exchange under the ticker symbol "DRS."  Options for the purchase or sale of DRS common stock trade on the Chicago Board Options Exchange, as well as the Philadelphia Stock Exchange and the NYSE Arca Exchange.  DRS's common stock is registered with the Commission pursuant to 12(b) of the Securities Exchange Act of 1934 ("Exchange Act").  Declaration of Kevin Guerrero and Exhibits thereto ("Guerrero Decl.") ¶11.

6

Headquartered in Rome, Italy, Finmeccanica designs and manufactures, among other things, helicopters, civil and military aircraft, satellites, missiles, and defense electronics. Shares of Finmeccanica are listed on the Milan Stock Exchange and also trade on the "Pink Sheets" in the United States under the ticker symbol "FINMF.PK." Guerrero Decl. ¶12.

On April 29, 2008, the price of a share of DRS common stock reached a high of $62.45 and closed at $61. On that same day, Unknown Purchaser bought 550 DRS call options due to expire in June 2008 with a strike price of $65, and, therefore, on the date they were purchased, the DRS options were not in-the-money. This purchase of DRS call options on represented 58.15 percent of the trading volume on April 29, 2008, for options in that series. Guerrero Decl. ¶14.

On May 5, 2008, the price of a share of DRS common stock reached a high of $64.81 and closed at $63.73. On that same day, Unknown Purchaser bought 170 DRS call options due to expire in June 2008 with a strike price of $70, and, therefore, on the date they were purchased, the DRS options were not in-the-money. This purchase of DRS call options represented 15.7 percent of the trading volume on May 5, 2008, for options in that series. Guerrero Decl. ¶15.

On May 6, 2008, the price of a share of DRS common stock reached a high of $63.99 and closed at $63.07. On that same day, Unknown Purchaser bought 170 DRS call options due to expire in June 2008 with a strike price of $70, and, therefore, on the date they were purchased, the DRS options were not in-the-money. This purchase of DRS call options represented 100 percent of the trading volume on May 6, 2008, for options in that series. Guerrero Decl. ¶16.

On May 7, 2008, the price of a share of DRS common stock reached a high of $64.4 and closed at $63.74. On that same day, Unknown Purchaser bought 930 DRS call options due to expire in June 2008 with a strike price of $65, and, therefore, on the date they were purchased,

7

the DRS options were not in-the-money. This purchase of DRS call options represented 53.1 percent of the trading volume on May 7, 2008, for options in that series. Guerrero Decl. ¶17.

Thus, between April 29, 2008 and May 7, 2008, Unknown Purchaser purchased 1,820 DRS call options, none of which were in-the-money, at a cost of $456,200. Guerrero Decl. ¶18. All of the purchases of DRS call options by Unknown Purchaser were through an omnibus account known as UBSL A/C Exchange Traded Derivative Account # 452-6020300 ("UBS Omnibus Account"), maintained by UBS AG of Zurich Switzerland and cleared through UBS Securities LLC. Guerrero Decl. ¶13.

**B.      Disclosure of Merger Negotiations between Finmeccanica and DRS**

On Thursday, May 8, 2008, the Wall Street Journal reported that Finmeccanica was in advanced talks to acquire DRS for a purchase price likely more than 25 per cent higher than its previous-day closing price of $63.74. That same day, May 8th, via a press release issued through Business Wire at 9:57 a.m. EST, DRS confirmed the Wall Street Journal report, announcing that it was "engaged in discussions contemplating a potential strategic transaction." Guerrero Decl. ¶4-5. These disclosures caused a reaction in the market, substantially increasing the volume and price of DRS common stock. At the close of trading on May 8th, the price of DRS common stock was up 15.9% from the previous day, at $73.89, on volume of 8,572,800 shares, compared with an average daily volume over the past three months of 738,948 shares. Guerrero Decl. ¶ 9.

In the weeks prior to the Article's publication on May 8, 2008, no major news organization reported either advanced discussions of an acquisition of DRS by Finmeccanica or speculation that DRS was a takeover target. Furthermore, during this time, both DRS and Finmeccanica took steps to ensure the confidentiality of the acquisition discussions. The

8

Commission is unaware of any article or indication of these negotiations available on the Internet or otherwise. Guerrero Decl. ¶ 7-8, 10.

### C.    Defendant Profits From The Sale of The APCC Call OPtions

Following the May 8, 2008 disclosures, Unknown Purchaser liquidated his entire DRS call option holdings and realized a profit of approximately $1.6 million. Guerrero Decl. ¶ 19.

### III.    UBS Ceases Further Transactions On Behalf Of Unknown Purchaser

On June 6, 2008 and July 7, 2008, the Commission requested the assistance of the Swiss Federal Banking Commission ("SFBC") in obtaining information concerning the purchase of APCC and DRS call options executed through UBS. Those inquiries revealed that the same individual originated, and is the beneficial owner of, the trades in APCC call options, and the trades in DRS call options described above. Swiss Federal Banking Commission Letter ("Swiss Ltr.")

After reviewing the trading activity of the Unknown Purchaser, UBS AG concluded that the trading activity appeared suspicious and decided, in application of Swiss regulation, not to execute further transactions on behalf of the Unknown Purchaser. The Unknown Purchaser was informed of this decision on July 10, 2008. Swiss Ltr.

The Unknown Purchaser also is aware of the Commission's request to the SFBC for information concerning the APCC trading, but as of July 24, 2008, is not aware of the Commission's similar request concerning the DRS trading. Swiss Ltr. Based upon these events, there is reason to believe that the Unknown Purchaser may end his banking and trading relationship with UBS AG at any moment and transfer his assets out of UBS AG and/or Switzerland. Swiss Ltr.

As of July 15, 2008, approximately half of the assets deposited with UBS by the

Unknown Purchaser is immediately available and could be moved at any time. The remainder of

Unknown Purchaser's assets are invested in shares of investment funds worth approximately

EUR 2.3 million. These shares cannot be redeemed before 4 August 2008. Swiss Ltr.

## ARGUMENT

I.    **An Order Freezing the Proceeds of the Suspicious Purchases in Accounts
      Held By Non-Parties Is Appropriate and Necessary to Protect the Public Interest**

   1.    **Legal Standard for Asset Freeze**

Section 21(d) of the Exchange Act authorizes the Commission to bring an action in a

proper U.S. District Court to enjoin acts or practices that violate the provisions of, and rules

promulgated under, the Exchange Act. 15 U.S.C. § 78u(d). Rule 65(b) of the Federal Rules of

Civil Procedure permits the entry of an ex parte temporary restraining order if (i) immediate and

irreparable injury, loss, or damage will result to the applicant before the adverse party can be

heard in opposition and (ii) counsel to the applicant certifies efforts, if any, made to provide

notice to the adverse party and reasons why notice is unnecessary. Fed. R. Civ. P. 65.

Pursuant to Section 21(d) of the Exchange Act, the United States Court of Appeals for the

Second Circuit has held that the district court has the authority, under proper circumstances, to

order an asset freeze so as "to facilitate enforcement of any disgorgement remedy that might be

ordered in the event a violation is established at trial." SEC v. Unifund Sal, 910 F.2d 1028, 1041

(2d Cir. 1990); SEC v. Manor Nursing Centers, 458 F.2d 1082, 1106 (2d Cir. 1972). An asset

freeze "simply assures that any funds that may become due can be collected," and, consequently,

requires a lesser showing than a preliminary injunction in the Second Circuit. Unifund, 910 F.2d

at 1041; SEC v. Gonzalez de Castilla, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) (an asset freeze

is warranted "even where the SEC has failed to meet the standard necessary to enjoin future

violations of the securities laws"). In particular, the Commission must establish only that it is likely to succeed on the merits, and need not show risk of irreparable injury, unlike a private litigant, or likelihood of a future violation. SEC v. Cavanagh, 155 F.3d 129, 132, 136 (2d Cir. 1998) (citing Unifund, 910 F.2d at 1036, 1041).

However, the Commission may show the likelihood of future violations, and thereby bolster its application for an asset freeze, SEC v. Margolin, 1992 WL 279735, *6-*7 (S.D.N.Y. 1992), if a defendant has made "efforts to move assets offshore." SEC v. Vaskevitch, 657 F. Supp. 312, 314 (S.D.N.Y. 1987); see also SEC v. Bremont, 954 F. Supp. 726, 730 n.3 (S.D.N.Y. 1997) (noting that Commission could have satisfied additional burden of showing likelihood of future violations where defendants transferred proceeds from transactions at issue to foreign bank accounts, and one defendant remained out of the United States and held a Liberian passport). When considering an asset freeze, a district court must weigh "the disadvantages and possible deleterious effect of a freeze" against "the considerations indicating the need for such relief." SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1106 (2d Cir. 1972).

Under Section 21(d) of the Exchange Act, a district court has jurisdiction to apply a freeze order to non-parties. SEC v. Heden, 51 F. Supp. 2d 296, 298-99 (S.D.N.Y. 1999); see also U.S. v. First Nat'l City Bank, 379 U.S. 378, 384 (1965) (district court's issuance of temporary injunction freezing assets of non-party bank "eminently appropriate to prevent further dissipation of assets" from foreign corporation's account). "Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." Cavanagh, 155 F.3d at 136 (internal citations omitted). A freeze order may also

11

operate as to assets that are not traceable to the illegal activity. SEC v. Grossman, 887 F. Supp. 649, 661 (S.D.N.Y. 1995).

2.  **The Commission Is Likely to Succeed on the Merits of Its Claim Against the Unknown Purchaser Because Strong Circumstantial Evidence Suggests Insider Trading Occurred in Violation of Exchange Act Section 10(b) and Rule 10b-5**

A person is liable for insider trading under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5] when he obtains material, nonpublic information intended to be used only for a proper purpose and then misappropriates or otherwise misuses that information in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits." Dirks v. SEC, 463 U.S. 646, 654 (1983); United States v. Newman, 664 F.2d 12 (2d Cir. 1981). Such a duty arises where the person is an "insider," a "temporary insider," an employee entrusted with confidential information by his employer, or a tippee of any of the foregoing who knew or should have known that the information was obtained in breach of a duty.

Furthermore, in the case of a tippee, liability may be established where an insider transmits the information to another and "receives a direct or indirect personal benefit from the disclosure, such as pecuniary gain or a reputational benefit that will translate into future earnings . . . [or] when an insider makes a gift of confidential information to a trading relative or friend." Dirks, 463 U.S. at 663-64.

The pattern of Unknown Purchaser's trading provides clear circumstantial evidence that he was trading on the basis of the material non-public information. On two separate occasions Unknown Purchaser made extremely propitious purchases of call options of two different companies in the days and weeks immediately before public disclosures and announcements relating to these companies' ultimate acquisitions. There is no evidence that any public

12

information was available concerning the potential acquisition of either APCC or DRS at the time Unknown Purchaser bought the call options described above. Moreover, the call options acquired by Unknown Purchaser in APCC and DRS were all out-of-the money and due to expire in a short period of time. This pattern of purchases of call options that would become worthless in a short period of time clearly leads to the conclusion that, at the time he bought the APCC and DRS call options, Unknown Purchaser anticipated that the price of their common stock was going to rise in the very near future.

Additionally, not only was Unknown Purchaser's acquisition of APCC call options all done within a few weeks of the public disclosure that Schneider would acquire APCC, Unknown Purchaser began buying APCC call options that were not in-the-money the day after APCC's Board of Directors privately notified Schneider that it was willing to have discussions about a possible sale of APCC to Schneider. These circumstances further support a reasonable conclusion that Unknown Purchaser had access to material, nonpublic information concerning the potential acquisition of APCC by Schneider at the time he bought the call options.

Few matters, if any, are more material than a corporation's involvement in a possible merger or acquisition. SEC v. Sekhri, 2002 WL 31100823, at *13 (S.D.N.Y. July 22, 2002) (citations and internal quotations omitted). See e.g., Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); SEC v. Musella, 748 F. Supp. 1028 (S.D.N.Y. 1989); SEC v. Tome, 638 F. Supp. 596, 623 (S.D.N.Y. 1986). The market reaction alone to the public announcement of the APCC and DRS acquisition transaction demonstrates that the information was viewed "by the reasonable investor as having significantly altered the 'total mix' of information made available." Levinson, 485 U.S. at 231-32 (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 439, 449 (1976)). The day Schneider announced it was acquiring APCC, the price of

13

APCC's common stock rose approximately 26 percent. On the day the acquisition discussions between Finmeccanica and DRS were disclosed, the price of DRS' common stock rose 16 percent.

The circumstantial evidence developed by the Commission to date provides more than sufficient basis for inferring that illegal insider trading has occurred. One who trades in securities while in possession of information that he knows or has reason to know is confidential and was improperly obtained, or who trades in reckless disregard of these facts, acts with scienter. See, e.g., Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 44-46 (2d Cir.), cert. denied, 438 U.S. 1039 (1978).

The law does not require direct evidence of scienter: as the Supreme Court has stated, "proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence." Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983). This is especially true in insider trading cases: "[p]roof of insider trading can well be made through an inference from circumstantial evidence and not solely upon a direct testimonial confession." SEC v. Singer, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992) (quoting SEC v. Bluestone, [1990-1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,880 (E.D. Mich. Jan. 24, 1991); accord, Musella, 678 F. Supp. at 1062-63. Indeed, most insider trading cases are based on circumstantial evidence; "there are generally two people who can provide direct evidence that insider trading has occurred – the source of the information and the trader. It is very rare for one of these two persons to admit that they have engaged in insider trading." Elysian Federal Savings Bank v. First Interregional Equity Corp., 713 F. Supp. 737, 744 (D. N.J. 1989) (quoting H.R. Rep. No. 100-09190, 100th Cong., 2d Sess. at 15, U.S. Code Cong. & Admin. News 1988, p. 6052).

This case is similar to many other insider trading cases where the SEC sought and obtained emergency relief based on circumstantial evidence that the defendants engaged in illegal insider trading.  For example, in <u>SEC v. Heider</u>, 1990 U.S. Dist. LEXIS 16246 (S.D.N.Y. 1990), the court entered an asset freeze and preliminary injunction against certain overseas defendants who had purchased large quantities of call options of Contel Corporation just prior to its merger with GTE Corp., notwithstanding the fact that the Commission had not identified the source of the material, nonpublic information.  In the context of denying defendants' motions to dismiss and Rule 9(b) motion, the court recognized:

> Although the S.E.C. has not named the source of the material, non-public information allegedly used by defendants . . . the circumstances surrounding the defendants' purchases are sufficient to draw a "strong inference" that they had scienter. . . . This extraordinary trading activity provides circumstantial evidence that the three defendants making these motions had scienter to commit fraud. <u>Id.</u> at *11-12.

Likewise, in <u>Unifund</u>, the Second Circuit upheld the District Court's entry of an asset freeze, despite the fact that the Commission was unable to identify the person who tipped the trading defendants.

The evidence presented here reflects strong circumstantial evidence that Unknown Purchaser illegally traded on inside information, and that the Commission is likely to succeed on the merits of its insider trading claim under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

   3.    **Irrespective of the Determination Of Likelihood of Success on the Merits, An Asset Freeze Is Still Appropriate Because the Unknown Purchaser's Assets Are Located In A Zurich-Based Brokerage Account, And They May Be Removed At Any Time.**

Courts in this District have frequently granted the Commission orders freezing assets in insider trading cases where, as here, there was a concern that the defendant might dissipate assets or

15

transfer assets beyond the jurisdiction of the United States. <u>See, e.g.</u>, <u>SEC v. Certain Unknown Purchasers of the Call Options of Duracell Int'l, Inc.</u>, 96 Civ. 7017 (S.D.N.Y. 1996) (asset freeze order entered by Judge Scheindlin); <u>SEC v. Roman</u>, 94 Civ. 3621 (SAS) (S.D.N.Y. 1994) (asset freeze order entered by Chief Judge Griesa); <u>SEC v. Tinajero</u>, 91 Civ. 2708 (JFK) (S.D.N.Y. 1991) (asset freeze order entered by Judge Owen); <u>SEC v. Heider</u>, 90 Civ. 4636 (CSH) (S.D.N.Y. 1990); <u>SEC v. Fondation Hai</u>, 90 Civ. 0277 (SWK) (S.D.N.Y. 1990); <u>SEC v. Finacor</u>, 89 Civ. 7667 (JMC) (S.D.N.Y. 1989); <u>SEC v. Wang and Lee</u>, 88 Civ. 4461 (RO) (S.D.N.Y. 1988); <u>SEC v. Banca Della Svizzera Italiana</u>, 81 Civ. 1836 (MP) (S.D.N.Y. 1981). Indeed, as the Second Circuit has recognized, an order requiring disgorgement will often be rendered meaningless unless an asset freeze is imposed prior to the entry of final judgment. <u>See, e.g.</u>, <u>International Controls Corp. v. Vesco</u>, 490 F.2d 1334, 1347 (2d Cir.), cert. denied, 417 U.S. 932 (1974); <u>SEC v. Vaskevitch</u>, 657 F. Supp. 312, 315 (S.D.N.Y. 1987) ("[a]s to the issue of an asset freeze, the court certainly has the ability to ensure that the defendants' assets are not secreted or dissipated before entry of final judgment concluding this action"); <u>SEC v. General Refractories Co.</u>, 400 F. Supp. 1248, 1259 (D.D.C. 1975) (it is within the Court's authority to grant effective equitable relief by temporarily freezing specific assets "in order to assure a source to satisfy that part of the final judgment which might [ultimately] be ordered").

An order freezing assets may also properly be directed to other persons or entities, who allegedly hold the funds on behalf of the defendant. <u>United States v. First Nat'l City Bank</u>, 379 U.S. 378 (1965). Moreover, once personal jurisdiction over a party is obtained, it is appropriate to enter a freeze order against that party to prevent the transfer of assets under its control, within or outside the United States. <u>Id.</u> at 384; <u>see</u> <u>United States v. Ross</u>, 302 F.2d 832, 834 (2d cir. 1962).

16

When there are concerns that defendants might dissipate assets, or transfer or secrete assets beyond the jurisdiction of the United States, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. Where "[t]here is a basis to infer that the . . . [defendants] traded on inside information, and while the Commission is endeavoring to prove at trial the requisite element of trading in breach of a fiduciary duty of which the defendants were or should have been aware, the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged." SEC v. Unifund SAL, 910 F.2d 1028, 1041 (2d Cir. 1990). Indeed, in Unifund the Court upheld an asset freeze order even though it found that the evidence was insufficient to uphold the entry of a preliminary injunction.

In this case, there is a well-founded basis for concluding that Unknown Purchaser engaged in insider trading. Moreover, there is a substantial basis to believe that he may attempt to dissipate such assets or move them beyond the jurisdiction of this Court. Unknown Purchaser is aware that the Commission has requested assistance from the SFBC for information concerning the APCC trading. He has also been told by UBS AG that it will no longer execute transactions on his behalf, and approximately half of his assets in the account with UBS AG may be removed at any time, and the remainder may be moved after August 4, 2008. Accordingly, absent intervention by this Court, the resulting proceeds from the liquidated APCC and DRS call options, representing illicit profits of approximately $3.3 million, could be removed by Unknown Purchaser or transferred to another account of which the Commission is unaware. An immediate order freezing Unknown Purchaser's assets, including the account containing the proceeds from the sales of the call options, is essential if there is to be any hope of enforcing a potential judgment.

17

## II.    An Order Requiring Identifying Information Is Necessary To Conduct This Litigation Effectively

The Commission also seeks an order requiring each defendant to promptly submit identifying information to this Court and the Commission including (a) its name, all business and residence addresses, postal box numbers, telephone numbers, facsimile numbers, e-mail addresses and nationality; and (b) a listing of each account with any financial institution or brokerage firm maintained by the defendants or for their direct and indirect beneficial interest. Such identifying information will assist the Commission in pursuing discovery and in effectuating the asset freeze, and will ensure that the Commission is able to effect service in a manner most likely to provide prompt actual notice.

## III.    An Order Granting Expedited Discovery Is Appropriate

The Commission seeks to depose witnesses, subpoena bank and brokerage records and other documents, and take other discovery on an expedited basis prior to a hearing on its application for a preliminary injunction continuing the asset freeze during this proceeding. Due to the gravity and timing of this situation, the Commission has brought this action expeditiously and has not had an opportunity to interview all persons who have information relevant to this matter, or to take any investigative testimony. The opportunity to take discovery prior to the hearing on the continuation of the asset freeze will enable the Commission to present a more complete evidentiary record to the Court and will sharpen and focus the issues that must be decided by the Court at such a hearing. Expedited discovery will also assist the Commission in properly effectuating any order entered by this Court freezing the assets in the account in which the illegal securities trades occurred.

## IV.    An Order Permitting Alternative Means of Service Is Appropriate

Rule 4(f)(3) of the Federal Rules of Civil Procedure provides that the Court may authorize alternative means for service of process in foreign countries. The Commission

respectfully requests that the Court authorize service upon Unknown Purchaser by serving him, in the manner described in the Commission's proposed order, via overnight delivery to UBS Securities LLC or UBS AG, Zurich, and any of their affiliates, successors in interest and assigns. The Commission will also make every effort to serve the defendant personally under Rule 4(f).

## V.    An Order Preventing the Alteration or Destruction of Documents Is Appropriate

In order to protect all documents necessary for full discovery in this matter, the Commission seeks an order preventing the alteration or destruction of documents. Such "innocuous" orders are routinely granted to protect the integrity of the litigation. See, e.g., Unifund SAL, 910 F.2d at 1040 n.11.

## VI.    A Repatriation Order Is Appropriate

The Commission also seeks a repatriation order requiring the defendants to return to identified accounts in the United States, all trading proceeds that may be located outside this Court's jurisdiction. Such equitable relief is appropriate where the Commission is seeking disgorgement in its prayer for relief. S.E.C. v. R.J. Allen and Assoc., Inc., 386 F. Supp. 866, 880-881 (S.D. Fla. 1974).

### CONCLUSION

For the reasons set forth above, the Commission respectfully requests that its request for emergency relief should be granted.

Dated:  Washington, D.C.
        July 25, 2008

                                              Respectfully submitted,


Of Counsel:
        Antonia Chion                         Richard E. Simpson (RS5859)
        Christopher Conte                     Jeffrey T. Infelise (DC 456998)
        Daniel Chaudoin                       100 F Street N.E.
        Mark J. Kreitman                      Washington, D.C.  20549-4030
        Noel A. Gittens                       202-551-4904
        Ivonia Slade                          202-772- 9245 (FAX)
        E. Laurita Finch                      simpsonr@sec.gov
        Kevin Guerrero                        infelisej@sec.gov
        Ilana Sultan
                                              Attorneys for Plaintiff
                                              Securities and Exchange Commission